UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Raymond Beaudette
and Lisa Beaudette,
    Plaintiffs

    v.                                         Civil No. 04-cv-142-SM
                                                  Opinion No. 2005 DNH
Louisville Ladder Group, LLC,
    Defendant

**O R D E R**

Raymond and Lisa Beaudette have sued Louisville Ladder Group, LLC ("Louisville Ladder") for injuries Raymond received when a ladder manufactured by Louisville Ladder collapsed under him. Plaintiffs assert claims of negligence, failure to warn, failure to give adequate instructions, breach of an implied warranty, and negligent infliction of emotional distress. Before the court is defendant's combined motion to exclude the testimony of plaintiffs' expert witness, under FED. R. EVID. 702, and for summary judgment. Plaintiffs object. For the reasons given, defendant's motion for summary judgment is granted.

Under the Federal Rules of Evidence, expert testimony is admissible if: "(1) the testimony is based upon sufficient facts

or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. As a general matter:

> The subject of an expert's testimony must be "scientific . . . knowledge."  The adjective "scientific" implies a grounding in the methods and procedures of science.  Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. . . .  [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation – i.e., "good grounds," based on what is known.  In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589-90 (1993) (footnotes omitted).  Based upon the foregoing principles, the Daubert Court discussed four factors which a trial court may use to determine the admissibility of proposed expert testimony: "testing, peer review, error rates, and 'acceptability' in the relevant scientific community."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (citation omitted) (holding that Daubert analysis also "applies to the testimony of engineers and other experts who are not scientists").  Moreover, under Daubert, "the

Rule 702 inquiry [is] 'a flexible one.'"  Kumho Tire, 526 U.S. at 150 (citation omitted).  "Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test . . . [and] that the gatekeeping inquiry must be tied to the facts of a particular case."  Id. (citations and internal quotation marks omitted, emphasis in the original).

In this case, plaintiffs propose to offer the testimony of Wilson G. Dobson, P.E., who holds a Bachelors of Science degree in Mechanical Engineering and a Master of Science degree in Materials Engineering.  Based upon plaintiffs' expert disclosure, they plan to introduce Mr. Dobson's opinion that the fiberglass ladder at issue in this case was unreasonably dangerous and defective because it failed to conform with paragraph 7.2 of the "American National Standard for Ladders – Portable Reinforced Plastic – Safety Requirements" ("ANSI A14.5") promulgated by the American National Standards Institute.  Defendants argue, correctly, that Mr. Dobson's opinion is inadmissible because it does not meet the requirements of Rule 702.

As a preliminary matter, it cannot be fairly disputed that Mr. Dobson is qualified, based upon his education and experience, to testify as an expert in the fields of mechanical and materials engineering. The problem is not one of engineering expertise or experience, <u>per se</u>, but a lack of expertise and experience with respect to the subject matter at issue – whether the failed ladder met the standard set out in paragraph 7.2 of ANSI A14.5. Plaintiffs propose to have Mr. Dobson give his opinion that the failed ladder did not meet the production standard described in paragraph 7.2 when it was manufactured and therefore was defective and dangerous.

Paragraph 7.2 of ANSI A14.5, which bears the heading "Manufacturing Process," provides as follows:

> The composite may be made by a continuous open-end molding process, such as the pultrusion method of manufacture. The product of any process which meets the performance requirements in Section 8 of this standard may be employed.
> The material shall be smooth, clean, uniform in color and reasonable [sic] free from conducting particles, foreign materials, pits, cracks, voids, chips, sink marks, delaminations, blisters, and scratches, in accordance with good commercial practice. <u>The distribution of filler, additives, or glass fiber shall be in accordance with good commercial practice. The material shall be free of resin-rich and resin-</u>

4

>   starved areas, and there shall be no evidence of significant reinforcement shifting, wrinkles, bunching up, or density variation within a length, all in accordance with good commercial practice.

(Pls.' Obj., Ex. 5 at 5 (emphasis added).)  Mr. Dobson "agree[s] the [ladder] rail, at least what he [defendant's expert] tested, meets or exceeds ANSI requirements."  (Def.'s Statement of Facts, Ex. B (Dobson Dep.) at 28.)  Even so, he maintains that the ladder was "dangerous and defective," based upon its alleged nonconformity with paragraph 7.2[1] and his theory that "[t]he result of this defect is a ladder that could meet the structural requirements of the ANSI standard, but would be prone to localized fracture on handling and use, with cracking occurring in the resin rich areas."  (Pls. Obj., Ex. 9 at 2.)

---

[1] That nonconformity was established, according to Dobson, by the following observations resulting from his microscopic examination of several pieces of the ladder rails:

- There were resin pockets and fiber free regions,
- there were folds in the fibers
- cracking followed the resin rich pockets,
- the cracking was confined to the corners between the web and flange.

(Pls.' Obj., Ex. 9 at 1-2.)

5

Paragraph 7.2 must be read in its entirety. Each of the three sentences addressing material specifications is qualified by the phrase "in accordance with good commercial practice." Thus, the sentence at issue in this case requires the material to be "free of resin-rich areas . . . in accordance with good commercial practice." However, nothing in Mr. Dobson's resume or testimony at the Daubert hearing suggests he has any expertise or experience with respect to "good commercial practice" relevant to fiberglass pultrusion. Indeed, at the hearing on this motion he conceded as much. Because the paragraph 7.2 standards are framed in terms of "good commercial practice," and because Mr. Dobson is not qualified in that area, Rule 702 precludes his testifying that the subject ladder did not meet the standard when it was manufactured. See 1325 "G" Street Assocs., LP v. Rockwood Pigments NA, Inc., No. Civ.A.DKC 2002-1622, 2004 WL 2191709, at *12 n.30 (D. Md. Sept. 7, 2004) ("Although Rich, as a licensed professional engineer, may be qualified to testify to certain matters under FRE 702 . . . [he] is not qualified to testify about the particular subject of what constituted good commercial practice . . .") (citations omitted).

Moreover, Mr. Dobson's lack of expertise and experience related to good commercial practice raises another problem with plaintiffs' theory and Mr. Dobson's proposed testimony.  Perhaps because Mr. Dobson is unfamiliar with what constitutes "good commercial practice" with regard to fiberglass ladder manufacturing, he completely disregarded the "good commercial practice" qualifier in his analysis and treated the paragraph 7.2 standard ("free of resin-rich areas") as an absolute proposition. Thus, by default, he assumed that the presence of <u>any</u> resin-rich areas in the ladder at manufacture (no matter how small or how few), necessarily runs afoul of paragraph of 7.2.  He further concluded, without an apparent basis in either expertise, experience, or acknowledged principles in the fields of fiberglass manufacturing, that the existence of <u>any</u> resin-rich areas necessarily leads to structural failure.  Mr. Dobson seemingly agreed at the hearing that he was unaware of any body of knowledge, or testing protocols, or relevant engineering literature that reliably establishes a relationship between a specific number or amount of resin-rich areas and structural failure.[2]  And, of course, paragraph 7.2 contemplates that

---

[2] In fact, he testified that he was aware of no scientific investigation into the question of how much resin-richness is

fiberglass ladder manufacturers must avoid resin-richness to an extent consistent with good commercial practice. Mr. Dobson simply cannot address that critical issue based upon his expertise and experience.[3]

Mr. Dobson's proposed opinion testimony to the jury – that the subject ladder did not meet the paragraph 7.2 standard when manufactured due to the presence of areas in the fiberglass that he identified as resin-rich, and that the ladder failed because of that condition – is inadmissible under FED. R. EVID. 702. Because expert testimony on causation is necessary for plaintiffs to prevail on their claim based upon manufacturing defects, see Estate of Joshua T. v. State, 150 N.H. 405, 408 (2003) (quoting Powell v. Catholic Med. Ctr., 147 N.H. 7, 14 (2000)), and they

---

necessary before a piece of fiberglass becomes subject to failure at or below its designed load limits.

[3] Finally, while it is not critical to this analysis, there appears to be another significant problem with Dobson's proposed testimony. He stated several times during the hearing that the ladder developed cracking that led to failure as a result of fatigue. This ladder was in use for quite some time, and Dobson's proposed opinion not only fails to take into account "good commercial practice" and whether such practices allows for some number or amount of resin-rich areas, but also fails to address the likelihood of failure based upon the resin-rich areas he found, assuming the ladder had been used as intended and within its proper weight-bearing ranges.

8

have disclosed no other expert witness to meet that burden, defendant is entitled to judgment as a matter of law on all claims premised on an alleged manufacturing defect. Those claims include both Count I (negligence/strict liability) and Count IV (breach of the implied warranty of merchantability). See Elliot v. Lachance, 109 N.H. 481, 484-85 (1969); Willard v. Park Indus., Inc., 69 F. Supp. 2d 268, 273-74 (D.N.H. 1999).

In addition, plaintiffs may not go forward on the failure-to-warn and failure-to-instruct claims (Counts II and III). Expert testimony is necessary on those issues, see Lemay v. Burnett, 139 N.H. 633, 634-36 (1995); Willard, 69 F. Supp. 2d at 272, and plaintiffs failed to disclose any warnings expert during the time allowed. Thus, defendant is entitled to summary judgment on plaintiffs' failure-to-warn and failure-to-instruct claims as well. Finally, because defendant is entitled to summary judgment on Counts I-IV, it is also entitled to summary judgment on Count V, the loss of consortium claim.

For the reasons given, defendant's motion for summary judgment (document no. 20) is granted. The clerk of the court

shall enter judgment in accordance with this order and close the case.

    **SO ORDERED.**

                                                    _____
                                                  Steven J. McAuliffe
                                                  Chief Judge

October 7, 2005

cc: counsel of record